UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| KEITH VOVILLIA, | ) | |
| | ) | |
| Plaintiff, | ) | 17 C 6056 |
| | ) | |
| vs. | ) | Judge Gary Feinerman |
| | ) | |
| ILLINOIS DEPARTMENT OF HUMAN SERVICES, | ) | |
| | ) | |
| Defendant. | ) | |

## Memorandum Opinion and Order

Keith Vovillia brings this suit against his former employer, the Illinois Department of
Human Services ("IDHS"), under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et
seq.*, alleging that he was (1) subjected to a hostile work environment because of his race and (2)
reassigned, suspended, and ultimately put on leave in retaliation for complaining internally and
to the Equal Employment Opportunity Commission ("EEOC") about racial harassment. Doc. 7.
With discovery concluded, IDHS moves for summary judgment. Doc. 35. The motion is
granted in part and denied in part.

## Background

The following facts are set forth as favorably to Vovillia, the nonmovant, as the record
and Local Rule 56.1 permit. *See Johnson v. Advocate Health & Hosps. Corp.*, 892 F.3d 887, 893
(7th Cir. 2018). On summary judgment, the court must assume the truth of those facts, but does
not vouch for them. *See Donley v. Stryker Sales Corp.*, 906 F.3d 635, 636 (7th Cir. 2018).

Vovillia, a white man, started working for IDHS as a Mental Health Tech Trainee at the
Ann M. Kiley Center in May 2010. Doc. 41 at ¶¶ 3, 5. In 2011, he was promoted to Mental
Health Tech I and assigned to one of the Kiley Center's homes for people with developmental

disabilities, where his responsibilities included cooking and cleaning for the residents and "basic teaching" duties. *Id*. at ¶ 7. His direct supervisor was Tawana Jackson, who was a Mental Health Tech II or III, and his next-level supervisor was Lisa Burton, the program coordinator. *Id*. at ¶ 9. In 2015, Vovillia was promoted to Mental Health Tech II, and Burton became his direct supervisor. *Id*. at ¶¶ 8-9; Doc. 37-2 at 5-6.

### A.    December 2014 UER

On December 28, 2014, Vovillia submitted an Unusual Event Report ("UER") to Desiree Anderson, a residential shift supervisor, reporting that coworkers were calling him a "racist" and a "rapist" and saying that he had a "little dick." Doc. 41 at ¶¶ 13-14. No Kiley Center employees had previously made derogatory comments to Vovillia. *Id*. at ¶ 13; Doc. 37-2 at 7. Vovillia told Anderson that he was not comfortable telling her who made the comments. Doc. 41 at ¶ 14. Anderson referred Vovillia's report to Melissa Calhoun, who in turn referred it for an internal investigation. *Id*. at ¶¶ 14-15.

Internal security investigator Larry Dolan conducted the investigation. *Id*. at ¶ 15. When Dolan interviewed Vovillia on December 28, Vovillia was vague and evasive and not answering questions. *Ibid*. After Dolan told Vovillia that he was going to terminate the interview, Vovillia showed Dolan his cell phone, where he had documented the statements he claimed his coworkers had made to him. *Ibid*. Specifically, Vovillia reported that Daryle Pearson called him a "perv" and an "asshole," that Eddie Barnes told him that he is a "murderer" and likes to "kiss babies," that Shalanda Handy told him he has a "little dick for kids," and that Jeffery Johnson and Marshall Bell told him that he was going to jail for rape. *Id*. at ¶ 16.

In response to Vovillia's UER, IDHS reassigned everyone involved; Vovillia was assigned to a position packing, stocking, and loading food in a warehouse. *Id*. at ¶ 17; Doc. 74 at ¶ 11; Doc. 37-2 at 12, 37; Doc. 37-6 at 6. IDHS's procedure during an investigation was to

reassign employees involved in workplace disputes to positions other than home assignments, so as to avoid further conflict that could affect residents. Doc. 41 at ¶ 18; Doc. 37-2 at 22. Every time Vovillia made a complaint about harassment, both he and the coworkers he complained about were removed from home assignments and assigned to different positions. Doc. 41 at ¶ 19; Doc. 37-2 at 22. After the investigation of the December 2014 UER concluded, Vovillia was returned to a home assignment. Doc. 41 at ¶ 17; Doc. 37-2 at 22. (Vovillia's Local Rule 56.1(b)(3)(B) response disputes ¶¶ 17-19 of IDHS's Local Rule 56.1(a)(3) statement on the ground that the factual assertions therein are "misleading," Doc. 41 at ¶¶ 17-19; in support, Vovillia cites ¶ 11 of his Local Rule 56.1(b)(3)(C) statement of additional facts, which characterizes his reassignment as retaliatory, Doc. 74 at ¶ 11. Because the challenged factual assertions are supported by the cited materials and are not controverted by Vovillia's characterization of their legal significance, the assertions are deemed admitted. *See* N.D. Ill. L.R. 56.1(b)(3)(C) ("All material facts set forth in the statement required of the moving party will be deemed to be admitted unless controverted by the statement of the opposing party.").)

As part of its investigation into the December 2014 UER, IDHS obtained written witness statements from Pearson, Barnes, Handy, Johnson, and Bell. Doc. 41 at ¶ 20; Doc. 37-8. All five denied saying anything threatening to Vovillia or seeing anyone else harass him. Doc. 41 at ¶ 20; Doc. 37-8 at 3, 7-10, 17-18, 21-22. (Vovillia's Local Rule 56.1(b)(3)(B) response disputes the truth of the witness statements but not the fact that the statements were made, Doc. 41 at ¶ 20, so IDHS's assertion that the witness statements were given is deemed admitted to the extent the assertion is supported by the cited materials.) Bell reported that he was "a bit concerned about [his] safety" because he felt that Vovillia was "delusional" and possibly "suffering from mental illness." Doc. 37-8 at 8. (Vovillia objects to Bell's witness statement on

the ground that it "is argumentative" and "calls for a medical conclusion" that Bell was not "qualified" to make. Doc. 41 at ¶ 20. The objection is overruled because, even if Bell's lay opinion would be inadmissible to prove that Vovillia was in fact "delusional" or mentally ill, Bell's statement is admissible to prove that he shared his concerns about Vovillia with IDHS.)

After the investigation was completed, Calhoun and Scott Jones (who worked in labor relations) met with Barnes and Bell to review IDHS's Rules of Employee Conduct and workplace violence and sexual harassment policies. *Id*. at ¶ 21; Doc. 37-6 at 6-7; Doc. 37-9 at 2-3. Vovillia testified at his deposition that he did not recall being assigned to the same home as either Barnes or Bell after he submitted the December 2014 UER, but that he continued to encounter them at work. Doc. 41 at ¶ 22; Doc. 37-2 at 30. (There is no need to determine the admissibility of Vovillia's subsequent averment that he was "replaced in a home with" Barnes and Bell, Doc. 69 at ¶ 5, because considering it would not affect the outcome of IDHS's summary judgment motion.)

### B.      December 2015 UER

Vovillia submitted a second UER on December 29, 2015, stating that during a class, "Wade the psychologist" told him, "You like to rape lil girls" and "You should go on trial[,] punk." Doc. 41 at ¶ 23; Doc. 37-10 at 2. In response to the UER, internal security investigator John Meade obtained written witness statements from four employees who attended the class and from the accused psychologist, Wade Frazier. Doc. 41 at ¶ 24; Doc. 37-11 at 2-6. Frazier denied making the comments or saying anything else to Vovillia, and the four witnesses denied hearing Frazier say anything to or about Vovillia. Doc. 41 at ¶ 24; Doc. 37-11 at 2-6. (Vovillia objects to the witness statements on hearsay grounds. Doc. 41 at ¶ 24. The statements are not hearsay because they are not offered for the truth of what the witnesses reported—that Frazier did not say anything to Vovillia—but rather as evidence of the information Meade gathered. *See Simpson v.*

*Beaver Dam Cmty. Hosps., Inc.*, 780 F.3d 784, 796 (7th Cir. 2015) (holding that a negative reference from the plaintiff's former employer was not hearsay because it had been "considered not for its truth, but to show its effect on the state of mind" of the defendant in rejecting the plaintiff's application); *Schindler v. Seiler*, 474 F.3d 1008, 1011 (7th Cir. 2007) ("[A] statement offered to show its effect on the person who heard the statement is not hearsay.").  Because IDHS's assertion that the witness statements were made is supported by the cited materials and is not controverted by Vovillia's response—which disputes the truth of the statements, but not that the witnesses made them, *ibid.*—the assertion is deemed admitted.)

### C.      March 2016 UER

Vovillia submitted a third UER on March 3, 2016, stating: "I am continuously and constantly every day at work, being harassed and provoked by almost everyone regarding the rumors at Kiley, calling and insinuating that I am a rapist, I like little kids, and that I am a snitch. I can not concentrate on my job." *Id.* at ¶ 25; Doc. 37-12 at 2.  In a written statement given to an internal investigator, Vovillia explained that the people harassing him were his home manager, staff in the home to which he was assigned, and staff in other homes.  Doc. 41 at ¶ 26; Doc. 37-13 at 2-3.  Vovillia added that the rumors about him had "spread around Lake County," including to "the gym, McDonald's, [and] the gas stations."  Doc. 41 at ¶ 26; Doc. 37-13 at 2-3. He asked that a supervisor direct the home manager and staff to stop harassing and provoking him.  Doc. 41 at ¶ 26.  Because Vovillia did not specify who was harassing him, his supervisor "talked to staff generally regarding provoking or harassing other staff."  *Id.* at ¶ 27.

### D.      September 2016 Altercation and Suspension

On September 9, 2016, Vovillia started a verbal altercation with a coworker, Adele Early-Coleman, in front of residents at the home where they were working.  *Id.* at ¶ 28; Doc. 37-14 at 2-11.  According to Early-Coleman, Vovillia confronted her while she was talking to another

coworker, Autumn Kars, and said that he was "tired of [her] bullshit" and knew that she was talking about him. Doc. 41 at ¶ 28; Doc. 37-14 at 2-3. Early-Coleman reported the altercation to her supervisor, Craig Smith. Doc. 41 at ¶ 28; Doc. 37-14 at 3-4. She also called the police and reported the altercation as "workplace violence" and a "verbal[] assault[]." Doc. 41 at ¶ 28; Doc. 37-14 at 4.

Meade conducted an investigation, interviewing witnesses and obtaining written statements. Doc. 41 at ¶¶ 29-30; Doc. 37-14. Kars stated that the day before the altercation, she told her supervisors—Calhoun and Lisa Schmidt, the unit administrator—that Vovillia sometimes made her feel uncomfortable "because he hears things and acts paranoid." Doc. 41 at ¶ 30; Doc. 37-14 at 20-21. Stephen Burttey, who worked in the same home as Vovillia, told Meade that he noticed Vovillia talking to himself "a few times" and believed that he was "paranoid and always think[s] somebody is after him." Doc. 41 at ¶ 29; Doc. 37-14 at 22. Burttey added that he had never heard anyone talking about Vovillia. Doc. 41 at ¶ 29; Doc. 37-14 at 22. (Vovillia objects to Burttey's witness statement, arguing that it is "argumentative," "lacks foundation," and "calls for a medical prognosis." Doc. 41 at ¶ 29. Because the witness statement is admissible to prove that Burttey shared his concerns with IDHS, the objection is overruled. Vovillia also asserts that Burttey's "opinion should be disregarded" because he "admits to not having much [sic] discussions with" Vovillia. *Ibid*. Vovillia does not cite anything in the record to support that assertion; in any event, the assertion does not controvert IDHS's account of what Burttey told Meade, which is supported by the cited materials.) Another of Vovillia's coworkers, Veronica Perry, reported that about three or four weeks before the September 9 altercation, Vovillia confronted her during a shift change, saying,

"You are talking shit about me." *Id*. at ¶ 31; Doc. 37-14 at 17. Perry denied that she or anyone else had been talking about Vovillia. Doc. 41 at ¶ 31; Doc. 37-14 at 18.

In October 2016, Schmidt suspended Vovillia for seven days, effective from November 16 through November 22, for conduct unbecoming a state employee. Doc. 41 at ¶ 32; Doc. 37-6 at 5; Doc. 37-15 at 2. Specifically, Schmidt determined that Vovillia violated IDHS's Rules of Employee Conduct by "us[ing] and engag[ing] in inappropriate language and behavior with a co-worker" and by "engag[ing] in disruptive interactions with a co-worker while in the presence of" residents, and that he had violated the Workplace Violence Policy. Doc. 41 at ¶ 32; Doc. 37-6 at 5; Doc. 37-15 at 2. The Rules of Employee Conduct prohibited employees from "us[ing] vulgar, profane or loud/disruptive language in the workplace or while on work status in a manner directed at or which could disturb clients and/or other staff." Doc. 41 at ¶ 67 (quoting Doc. 37-30 at 1). The Kiley Center's workplace guidelines for employees assigned to homes further provided: "Speak in normal, conversational tones. There should be no altercations, verbal or otherwise. Any altercation will be addressed as potential workplace violence and an internal investigation will be initiated. Yelling, screaming or shouting can also be considered a reportable incident." *Id*. at ¶ 68 (quoting Doc. 37-30 at 6). Vovillia acknowledged that his failure to comply with IDHS and Kiley Center policies could result in discipline up to and including discharge. *Id*. at ¶ 71.

### E.     December 2016 UER and Administrative Leave

On December 2, 2016, Vovillia submitted a fourth UER, stating: "Rumors are continuing at Kiley. I am still being harrassed [sic] every day. My coworkers are saying that I am going to get killed. People around town are also saying I am going to die, get killed now as well. I am afraid I will lose my life." Doc. 41 at ¶ 33; Doc. 37-16 at 2. Smith, the residential services supervisor, spoke with Vovillia about the UER. Doc. 41 at ¶ 34. Vovillia told Smith that

individuals who were not Kiley Center employees had been yelling at him out of their car windows, warning him that people were after him. *Ibid*. Vovillia said that he was not worried about getting hurt because he had a concealed carry permit, but he denied having a gun on state property that day. *Ibid*. Smith reported the conversation to Calhoun and Schmidt. *Ibid*.

Later that day, Schmidt spoke with Vovillia and asked whether the people around town who were harassing him were Kiley Center staff; Vovillia said that they were not. *Id*. at ¶ 35. Schmidt also asked whether Vovillia had gone to an employee assistance program appointment with a psychologist as IDHS had recommended, and Vovillia told her that he went to one appointment but would not return because the psychologist made harassing comments when Vovillia turned his back. *Ibid*.; Doc. 37-18 at 2.

The police were called in response to Vovillia's mentioning his concealed carry permit. Doc. 41 at ¶ 36; Doc. 37-19 at 2. When the police arrived, Meade spoke with Vovillia, who denied having a weapon on him but refused to consent to a search of his vehicle on the ground that it was "messy." Doc. 41 at ¶ 36; Doc. 37-19 at 2. The officers then met with Vovillia, after which they told Meade that they would not take any action because Vovillia was not making threats to himself or others or acting out of control. Doc. 41 at ¶ 36; Doc. 37-19 at 2. (Vovillia's Local Rule 56.1(b)(3)(B) response denies these facts, contending that "employees had stated they would lie to get [Vovillia] out of the unit and this false police report does not say who had called in the false allegation." Doc. 41 at ¶ 36. Because these facts are supported by the record materials cited by IDHS and Vovillia's response does not controvert Meade's account of his interactions with Vovillia and the police, the facts are deemed admitted.)

Later that day, Vovillia was placed on administrative leave pending a fitness for duty evaluation, to which his union contract required him to submit at IDHS's request. Doc. 41 at

¶¶ 10, 38; Doc. 37-21.  Jones, the labor relations employee who documented the decision to place Vovillia on leave, gave this justification:

> Continued psychological concerns of what is being allegedly heard by the employee, the employees [sic] unprofessional and intimidating response to what he allegedly hears while on/off duty and the self-reporting that he has a Conceal [sic] Carry Permit now, which raises concerns for the safety of those served and employed [on] Facility Grounds.  The Facility is pursuing a Fitness for Duty Evaluation and this evaluation is "pending."

Doc. 41 at ¶ 38; Doc. 37-21 at 2.  Kimberly Kilpatrick, the facility director, approved the decision, as did the IDHS Secretary.  Doc. 41 at ¶ 38; Doc. 37-21 at 4.

### F.    April 2017 Fitness for Duty Evaluation and Disability Leave

Dr. Robert Hanlon, a neuropsychologist, evaluated Vovillia on April 12, 2017.  Doc. 41 at ¶¶ 39-40.  Vovillia answered questions about his physical and mental health and took a 500-question multiple choice test.  *Id*. at ¶ 40; Doc. 37-2 at 14.  In a fitness for duty evaluation provided to IDHS, Dr. Hanlon diagnosed Vovillia with "mixed personality disorder with paranoid, narcissistic, and antisocial features."  Doc. 41 at ¶¶ 41-42; Doc. 37-24 at 2.  Dr. Hanlon opined that Vovillia's "paranoia, combined with the likelihood that his paranoid ideation intermittently escalates to the level of delusional beliefs regarding his coworkers," made him unfit to perform his job responsibilities as a Mental Health Tech II.  Doc. 37-24 at 3.  Dr. Hanlon further opined that "given [Vovillia's] reported belief that nearly all of his coworkers and supervisors at the [Kiley Center] are engaged in harassment of him, he is not currently fit to perform any occupation at the" Kiley Center.  *Ibid*.  Dr. Hanlon recommended referring Vovillia for a "psychiatric consultation to determine his potential to benefit from psychotropic medication" and psychiatric treatment, as well as restricting him from possessing a firearm on Kiley Center grounds.  *Ibid*.  (Vovillia disputes the facts regarding the fitness for duty evaluation, stating that he slept for only two hours the night before the exam, that he was not told the extent

of the testing Dr. Hanlon would perform, and that Dr. Hanlon did not discuss his findings with Vovillia or allow him any "input to the … diagnosis." Doc. 41 at ¶¶ 40-42.  Because Vovillia's account does not controvert IDHS's assertions as to what Dr. Hanlon concluded and reported to IDHS, IDHS's assertions are deemed admitted to the extent they are supported by the cited materials.)

On April 28, 2017, Adriana Cisneros, IDHS's director of human resources and labor relations, sent Vovillia a letter informing him that IDHS had received documentation indicating that he was unfit to work and that he would therefore "be placed on a non-service connected disability leave." *Id*. at ¶ 43; Doc. 37-25 at 2.  The letter added: "In order to support your leave of absence, you are required to submit an updated, valid medical statement at least once every thirty (30) days." Doc. 37-25 at 3 (emphasis omitted).

Vovillia did not seek treatment from a psychiatrist, psychologist, neuropsychologist, or counselor. Doc. 41 at ¶ 45.  Nor did he submit any of the medical statements required to support a continued leave of absence, have another physician certify that he was fit for duty, or consult with a doctor about taking antipsychotic medication. *Id*. at ¶¶ 47-48.  (Vovillia's Local Rule 56.1(b)(3)(B) response disputes these facts, citing a declaration in which he avers that he was unable to afford medical treatment because his leave was unpaid. *Ibid*.; Doc. 69 at ¶ 8.  Because IDHS's assertions that Vovillia did not submit required documentation, have another physician certify his fitness for duty, or consult with a doctor about taking medication are supported by the cited materials and not controverted by Vovillia's explanation of *why* he did not take those actions, IDHS's assertions are deemed admitted.)

On September 18, 2017, Vovillia resigned from his position at the Kiley Center.  Doc. 41 at ¶ 49.  His resignation letter stated that he "should have never been placed on a mental health

leave in the first place." *Ibid.*; Doc. 37-26 at 2. Vovillia decided to resign because he felt that he was not receiving any assistance with the conduct he considered harassment. Doc. 74 at ¶ 14.

### G. Vovillia's Additional Harassment Allegations

Vovillia testified at his deposition that he had suffered additional harassment beyond the conduct discussed above. For summary judgment purposes, the court must accept that the harassing conduct occurred as Vovillia described it.

In 2015 or 2016, several African-American coworkers—one whose first name is Kierra and others whose names he cannot recall—called him "vanilla swole," which he took to mean that he was a "[l]arge, muscular" "Caucasian man." Doc. 41 at ¶ 51; Doc. 74 at ¶ 2; Doc. 37-2 at 7. Vovillia reported the comments to Burton, his program coordinator. Doc. 41 at ¶ 51. Barnes, who is African-American, commented two or three times about Vovillia's driving a pickup truck, asking him whether he "was going to throw like a Confederate flag on there." *Id.* at ¶ 52; Doc. 74 at ¶ 3; Doc. 37-2 at 7. Barnes also spat in Vovillia's direction, gave him the finger, tried to intimidate and provoke him by "getting in his space," and called him "feetzy." Doc. 74 at ¶ 3; Doc. 37-2 at 11, 23. Vovillia reported some of Barnes's behavior to Burton. Doc. 74 at ¶ 3; Doc. 37-2 at 8, 11. A white psychologist whose name Vovillia cannot recall also gave him the finger, but he did not report it. Doc. 41 at ¶ 56; Doc. 37-2 at 11. In December 2016, Jeanie Perkins, a supervisor for "DC01," a work training program run separately from the homes, told Vovillia that he was going to die. Doc. 74 at ¶ 12; Doc. 37-2 at 12-13.

In addition, several African-American Kiley Center employees, including shift supervisors Anderson and Dorothy Lovejoy, would tell him that he had a "little dick" or would make a "little dick sign" by holding a thumb and index finger a couple of inches apart while holding a fist. Doc. 41 at ¶ 53; Doc. 74 at ¶¶ 4-6; Doc. 37-2 at 21. Anderson also told Vovillia that he "liked to rape little girls." Doc. 74 at ¶ 10. Burton, who is white, told Vovillia's

coworkers "at least once or twice" to "leave the white boy alone." Doc. 41 at ¶ 54. Each time Burton did so, Vovillia's coworkers would stop bothering him for a while. *Ibid*. Vovillia believes that Burton retaliated against him for reporting racial harassment by failing to resolve his complaints. *Id*. at ¶¶ 61-62.

At some point, Early-Coleman and Kars told Vovillia that they wanted to get him out of the Kiley Center and would lie to do so. *Id*. at ¶ 55; Doc. 74 at ¶ 8; Doc. 37-2 at 10. (IDHS's hearsay objection to Early-Coleman's and Kars's statements is overruled. To the extent those statements are offered as examples of harassing comments made to Vovillia rather than for their truth, they are not hearsay. *See Anderson v. United States*, 417 U.S. 211, 220 & n.8 (1974) ("[E]vidence is not hearsay when it is used only to prove that a prior statement was made and not to prove the truth of the statement."); *Simpson*, 780 F.3d at 796; *Schindler*, 474 F.3d at 1011. And to the extent those statements are offered for their truth, they are admissible under Evidence Rule 803(3) as "statement[s] of the declarant's then-existing state of mind (such as motive, intent, or plan)." Fed. R. Evid. 803(3); *see Flanagan v. Office of the Chief Judge of the Circuit Court of Cook Cnty.*, 893 F.3d 372, 374-75 (7th Cir. 2018) (holding that the declarant's "statement that he was 'going to do it'" fell within the Rule 803(3) hearsay exception).)

## H. Vovillia's EEOC Charge and Suit

On July 18, 2016, after submitting his first three UERs and after some of the allegedly harassing conduct had occurred, Vovillia filed a charge of discrimination with the EEOC. The charge claimed that Vovillia had been subjected to a hostile work environment "because of [his] Race (Hispanic) and [his] National Origin (mix of Puerto Rican, Mexican and Lithuania[n])," that his supervisors did nothing in response to his complaints and "continue[d] to allow this offensive conduct by coworkers," and that he had been subjected to retaliation. Doc. 41 at ¶ 72; Doc. 37-33 at 2. Vovillia testified at his deposition that he considers his race to be white, not

Hispanic.  Doc. 41 at ¶ 73; Doc. 37-2 at 13.  The EEOC issued a right to sue letter on May 19, 2017, Doc. 41 at ¶ 74, and Vovillia filed this suit on August 19, 2017, Doc. 1.

**Discussion**

As noted, Vovillia claims that IDHS violated Title VII: (1) by subjecting him to a hostile work environment due to his race, and (2) by reassigning him, suspending him, and placing him on leave in retaliation for complaining internally and to the EEOC about unlawful harassment to which he claims to have been subjected.

## I.    Hostile Work Environment Claim

Title VII's discrimination provision makes it "unlawful … for an employer … to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin."  42 U.S.C. § 2000e-2(a)(1).  The provision "encompasses the creation of a hostile work environment that is severe or pervasive enough to affect the terms and conditions of employment."  *Lord v. High Voltage Software, Inc.*, 839 F.3d 556, 561 (7th Cir. 2016) (internal quotation marks omitted).  For Vovillia's hostile work environment claim to survive summary judgment, he must adduce evidence sufficient for a reasonable jury to find that: "(1) the work environment was both objectively and subjectively offensive; (2) the harassment was based on membership in a protected class or in retaliation for protected behavior; (3) the conduct was severe or pervasive; and (4) there is a basis for employer liability."  *Abrego v. Wilkie*, 907 F.3d 1004, 1014 (7th Cir. 2018) (internal quotation marks omitted).

IDHS contends in its reply brief that Vovillia failed to exhaust his administrative remedies because, although he claimed in his EEOC charge that he was harassed because he is Hispanic, he alleges in this suit that he was harassed because he is white.  Doc. 73 at 6.  Failure to exhaust is an affirmative defense in a Title VII suit.  *See Laouini v. CLM Freight Lines, Inc.*,

586 F.3d 473, 475 (7th Cir. 2009) ("Failure to timely file an administrative charge is an affirmative defense … ."). Because the discrepancy between the allegations in Vovilla's EEOC charge and the allegations in his complaint was apparent from the face of the complaint and its attachments, *compare* Doc. 7 at ¶ 4 (operative complaint alleging that Vovillia is a "Caucasian male"), *with id*. at p. 8 (EEOC charge alleging discrimination "because of my Race (Hispanic)"), IDHS forfeited its exhaustion defense by failing to plead it as an affirmative defense. *See Fort Bend Cnty. v. Davis*, 139 S. Ct. 1843, 1846 (2019) (holding that "Title VII's charge-filing instruction is not jurisdictional" and therefore is "subject to forfeiture if tardily asserted"); Fed. R. Civ. P. 8(c)(1) ("In responding to a pleading, a party must affirmatively state any avoidance or affirmative defense … ."). And even putting aside its failure to plead exhaustion as an affirmative defense, IDHS forfeited its exhaustion argument by not pressing the defense until its reply brief. *See Narducci v. Moore*, 572 F.3d 313, 324 (7th Cir. 2009) ("[T]he district court is entitled to find that an argument raised for the first time in a reply brief is forfeited."); *Cromeens, Holloman, Sibert, Inc. v. AB Volvo*, 349 F.3d 376, 389 (7th Cir. 2003) ("Because Volvo raised the applicability of the Maine statute in its reply brief, the district court was entitled to find that Volvo waived the issue.").

On the merits, IDHS argues that it is entitled to summary judgment because: (1) Vovillia "has not connected his harassment to his race," Doc. 36 at 7-8; (2) the harassment was not severe or pervasive, *id*. at 8-9; and (3) there is no basis for employer liability, *id*. at 10-11. These arguments fail to persuade, at least on summary judgment.

First, IDHS contends that no reasonable jury could conclude that the alleged harassment was based on Vovillia's race because most of the harassing comments were not racially charged and any comments identifying his race were either compliments ("vanilla swole") or directed at

the alleged harassers ("leave the white boy alone").  *Id*. at 7-8.  IDHS's contention rests on an incorrect premise: Vovilla need not "identify an explicitly racial dimension of the challenged conduct to sustain a Title VII claim," but rather need only "attribute a racial character or purpose to it."  *Vance v. Ball State Univ.*, 646 F.3d 461, 470 (7th Cir. 2011) (internal quotation marks omitted), *aff'd*, 570 U.S. 421 (2013); *see also Beamon v. Marshall & Ilsley Tr. Co.*, 411 F.3d 854, 863-64 (7th Cir. 2005) ("[T]he alleged harassment must be sufficiently connected to race before it may reasonably be construed as being motivated by the defendant's hostility to the plaintiff's race.") (internal quotation marks omitted).  Put another way, although "the traditional [race-based] hostile work environment claim" involves hostility that is expressed in racial terms, such as "racial slurs, epithets, or other overtly race-related behavior," *Luckie v. Ameritech Corp.*, 389 F.3d 708, 713 (7th Cir. 2004), the dispositive question is whether the plaintiff was subjected to hostility—whether or not expressed in racial terms—*because of* his race, *see Orton-Bell v. Indiana*, 759 F.3d 768, 774-75 (7th Cir. 2014) (holding, in the context of a sex-based hostile work environment claim, that the plaintiff must prove that the conduct occurred "*because she was a woman*," not that the conduct was "merely tinged with offensive sexual connotations") (internal quotation marks omitted).

The present record would allow a reasonable jury to find that Vovillia was harassed due to his race.  Some aspects of the alleged harassment were not inherently racial.  *E.g.*, Doc. 37-2 at 11 (Vovillia testifying that Barnes gave him the finger).  But because the "vanilla swole" and "white boy" comments explicitly singled out Vovillia as white—and thus had a "racial character," *Vance*, 646 F.3d at 470—a reasonable jury easily could find that the overall pattern of harassment was racially motivated.  *See Cole v. Bd. of Trs. of N. Ill. Univ.*, 838 F.3d 888, 896 (7th Cir. 2016) ("[F]orms of harassment that might seem neutral in terms of race … can

contribute to a hostile work environment claim if other evidence supports a reasonable inference tying the harassment to the plaintiff's protected status."); *Orton-Bell*, 759 F.3d at 774 n.5 (noting that where some of the harassing conduct is explicitly based on the plaintiff's protected characteristic, "an inference of discriminatory motive might be reasonable" as to other conduct by the same harassers).  Accordingly, a reasonable jury could find that "the harassment was based on [Vovillia's] membership in a protected class." *Abrego*, 907 F.3d at 1015.

Second, IDHS contends that the alleged harassment consisted of "sporadic offensive utterances" that do not satisfy the "severe or pervasive" element of a hostile work environment claim.  Doc. 36 at 8-9.  The "severe or pervasive" element "is in the disjunctive—the conduct must be *either* severe *or* pervasive." *Vance*, 646 F.3d at 469.  This means that "one extremely serious act of harassment could rise to an actionable level[,] as could a series of less severe acts." *Hall v. City of Chicago*, 713 F.3d 325, 330 (7th Cir. 2013) (internal quotation marks omitted).  A court addressing whether harassing conduct is "severe or pervasive" must consider "factors like the frequency of improper conduct, its severity, whether it is physically threatening or humiliating (as opposed to a mere offensive utterance), and whether it unreasonably interferes with the employee's work performance." *Boss v. Castro*, 816 F.3d 910, 920 (7th Cir. 2016); *see also Johnson*, 892 F.3d at 900 (similar).  In so doing, the court must bear in mind that Title VII does not impose a "general civility code" and that "simple teasing, offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the terms and conditions of employment." *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998) (citation and internal quotation marks omitted).  That said, "the [work] environment need not reach the point of 'hellishness'" to be actionable. *Johnson*, 892 F.3d at 901; *accord Gates v. Bd. of Educ. of Chi.*, 916 F.3d 631, 637 (7th Cir. 2019) ("While a 'hellish' workplace is surely

actionable, plaintiffs' evidence need not show a descent into the Inferno."). "Whether harassment was so severe or pervasive as to constitute a hostile work environment is generally a question of fact for the jury." *Johnson*, 892 F.3d at 901.

Drawing all reasonable inferences in Vovillia's favor, the record shows that the alleged harassment went far beyond a handful of isolated incidents. Rather, Vovillia was subjected to a continuous stream of harassment at the hands of multiple supervisors and coworkers over a two-year period, including routinely being ridiculed as a child "rapist" with a "little dick." Moreover, the harassment interfered with Vovillia's work performance by making it difficult for him to concentrate and by forcing him to devote time to making verbal complaints to his supervisors, submitting UERs, and participating in investigations when he could otherwise have been performing his assigned duties. A reasonable jury thus could find that Vovillia suffered a "constant barrage" of harassment that altered the conditions of his employment. *Orton-Bell*, 759 F.3d at 775 (holding that a "constant barrage of sexually charged comments" was sufficiently severe or pervasive to support a hostile work environment claim); *see also Cerros v. Steel Techs., Inc.*, 288 F.3d 1040, 1047 (7th Cir. 2002) ("[A] relentless pattern of lesser harassment that extends over a long period of time also violates [Title VII].").

Third, IDHS argues that even if Vovillia was subjected to a hostile work environment due to his race, there is no basis for employer liability because "[a]ll of the alleged harassing statements that were directed at [Vovillia] came from his coworkers" and his supervisors responded reasonably to each complaint. Doc. 36 at 10-11. Vovillia responds that some of the harassment *did* come at the hands of his supervisors, and that IDHS did not do enough to stop his coworkers from continuing to harass him. Doc. 43 at 2-3, 7, 11.

To determine whether there is a basis for employer liability, the court "must first decide whether the alleged harassment was perpetrated by supervisors or coworkers." *Nischan v. Stratosphere Quality, LLC*, 865 F.3d 922, 930 (7th Cir. 2017) (internal quotation marks omitted). If the harasser was the plaintiff's supervisor—that is, if the harasser had "the power to directly affect the terms and conditions of the plaintiff's employment," including "the authority to hire, fire, promote, demote, discipline or transfer [the] plaintiff"—then the employer "is strictly liable" for the harassment. *Ibid.* (internal quotation marks omitted). If the harasser "was merely a coworker," by contrast, then the employer "is liable only if it was negligent either in discovering or remedying the harassment." *Ibid.* (internal quotation marks omitted). An employer is negligent in remedying harassment if "it failed to take prompt and appropriate corrective action reasonably likely to prevent the harassment from recurring." *Cole*, 838 F.3d at 898 (internal quotation marks omitted).

Even setting aside the question whether Vovillia's supervisors' conduct independently provides a basis for employer liability, a reasonable jury could find that IDHS was negligent in remedying the harassment allegedly perpetrated by his coworkers. True enough, IDHS promptly investigated Vovillia's allegations each time he filed a UER, Doc. 41 at ¶¶ 14-15, 24-27, 33-34, counseled Barnes and Bell in response to the first UER, *id*. at ¶ 21, and counseled staff in general in response to the third UER, *id*. at ¶ 27. But IDHS's responses failed to stop the harassment, *id*. at ¶ 33, and that failure, while not dispositive, is relevant to whether the responses were reasonable. *See May v. Chrysler Grp.*, 716 F.3d 963, 971 (7th Cir. 2013) ("[S]uccess or failure [in] stopping the harassment does not determine whether an employer is liable. Nevertheless, the efficacy of an employer's remedial action is material to a determination whether the action was reasonably likely to prevent the harassment from recurring.") (alteration and internal quotation

marks omitted).  Moreover, Vovillia adduces evidence that Burton directed the alleged harassers to "leave the white boy alone."  Doc. 41 at ¶ 54.  Although Burton's comments appear to have been part of an attempt to stop the harassment, a reasonable jury could find that they signaled to Vovillia's coworkers that it was acceptable to label him based on his race—and thus to treat him as "the white boy."  By injecting race into the workplace, Burton muddled whatever message against harassment that IDHS was sending when it counseled employees in response to Vovillia's complaints.  And even if Anderson was not *Vovillia's* supervisor in the sense required for strict liability, it is undisputed that she was *a* supervisor, *see id*. at ¶¶ 8-9 (identifying only Jackson and Burton as Vovillia's direct supervisors); *id*. at ¶ 14 (identifying Anderson as the shift supervisor to whom Vovillia submitted his first UER), and Vovillia adduces evidence that she participated in the harassment by making the "little dick sign" and telling him that he had a "little dick" and "liked to rape little girls," *id*. at ¶ 53; Doc. 74 at ¶¶ 5, 10.  Similarly, Perkins, while not *Vovillia's* supervisor, was *someone's* supervisor, and she, too, joined in by telling Vovillia that he was going to die.  Doc. 74 at ¶ 12; Doc. 37-2 at 12-13.  By participating in the harassment, Anderson and Perkins implicitly communicated to lower-ranking employees that harassing behavior is acceptable, which in turn undercut IDHS's attempts to stop the behavior.

In sum, a reasonable jury could find that an employer's action in verbally counseling employees regarding anti-harassment policies is not "reasonably likely," *Cole*, 838 F.3d at 898, to stop the employees' harassing behavior when the harassers see supervisors both taking part in the same kind of behavior and otherwise injecting race into the workplace.  Thus, a jury could reasonably conclude that Burton's comments and Anderson's and Perkins's involvement tainted IDHS's responses to the harassment and, particularly given their lack of success, rendered the responses unreasonable.  *See May*, 716 F.3d at 971; *Gallagher v. C.H. Robinson Worldwide,*

*Inc.*, 567 F.3d 263, 268-69, 275, 277 (6th Cir. 2009) (holding that a reasonable jury could find that the employer's response to coworkers' harassment was unreasonable where a supervisor "participated in some of" the conduct).

IDHS accordingly is not entitled to summary judgment on Vovillia's hostile work environment claim.

## II.    Retaliation Claim

Title VII's retaliation provision "prohibits retaliation against employees who engage in statutorily protected activity by opposing an unlawful employment practice." *Lord*, 839 F.3d at 563 (citing 42 U.S.C. § 2000e-3(a)).  Vovillia contends that IDHS retaliated against him for complaining about racial harassment, including in his UERs and his July 2016 EEOC charge, by (1) reassigning him to less desirable positions outside the Kiley Center homes, (2) suspending him in October 2016, and (3) placing him on involuntary leave.  Doc. 43 at 3-4, 12-13; Doc. 7 at ¶ 26.  Under the framework set forth in *Ortiz v. Werner Enterprises, Inc.*, 834 F.3d 760 (7th Cir. 2016), a Title VII retaliation claim survives summary judgment if the plaintiff presents evidence that, considered as a whole, would allow a reasonable jury to find that his protected activity caused the adverse employment action.  *Id*. at 765.  IDHS is entitled to summary judgment because no reasonable jury could find on the present record that IDHS took the challenged actions because of Vovillia's protected activity (his complaints about racial harassment) rather than for legitimate, nonretaliatory reasons.

### A.    Reassignments

IDHS acknowledges that it reassigned Vovillia in response to his UERs, but argues that it did so for a nonretaliatory reason—that IDHS's policy for handling a reported conflict among employees was to (1) separate the employees to prevent further conflict and (2) remove the employees from home assignments pending an investigation to preserve an appropriate

environment for the residents.  Doc. 41 at ¶ 18; Doc. 36 at 15; Doc. 37-2 at 22.  Consistent with

that policy, IDHS during each investigation reassigned both Vovillia and the employees he

complained about to positions outside the homes where the conflicts occurred—which meant

performing tasks like packing, stocking, and loading food in a warehouse—and then returned

them to home assignments after the investigation concluded.  Doc. 41 at ¶¶ 17-19; Doc. 74 at

¶ 11; Doc. 37-2 at 22.  IDHS's reasons for taking that approach—preventing further conflict and

avoiding disruptions to the Kiley Center's residential environment and services—are legitimate.

*See Mercer v. Cook Cnty.*, 527 F. App'x 515, 523 (7th Cir. 2013) ("Mercer … was moved

[pending an investigation] because she had complained that her work environment was hostile

and the Sheriff's Office did not wish to keep her in a potentially hostile work environment.  This

is certainly a legitimate justification for moving her."); *Stutler v. Ill. Dep't of Corr.*, 263 F.3d

698, 703 (7th Cir. 2001) (holding that no reasonable jury could find that a temporary

reassignment was in retaliation for the plaintiff's complaint that her supervisor was verbally

abusing her, where the reassignment was an attempt to diffuse the tension between the plaintiff

and her supervisor).  Nothing in the record discredits that explanation.  Accordingly, no

reasonable jury could find that IDHS reassigned Vovillia because of his protected activities.

### B.  Suspension

IDHS argues that its October 2016 decision to suspend Vovillia was not retaliatory, but

rather a legitimate response to his violating its code of conduct by "making verbally aggressive

and profane statements to coworkers in front of a resident."  Doc. 36 at 14.  Vovillia does not

respond to this argument, thus forfeiting the point and his retaliation claim as to the suspension.

*See Nichols v. Mich. City Plant Planning Dep't*, 755 F.3d 594, 600 (7th Cir. 2014) ("The non-

moving party waives any arguments that were not raised in its response to the moving party's

motion for summary judgment."); *Keck Garrett & Assocs. v. Nextel Commc'ns, Inc.*, 517 F.3d

476, 487 (7th Cir. 2008) ("Nextel specifically requested summary judgment on the quantum meruit claim.  Keck Garrett, however, did not defend that claim in its reply to Nextel's motion for summary judgment.  By failing to present its argument to the district court, Keck Garrett abandoned its claim."); *Witte v. Wis. Dep't of Corr.*, 434 F.3d 1031, 1038 (7th Cir. 2006) ("By failing to raise [an argument] in his brief opposing summary judgment, [the plaintiff] lost the opportunity to urge it in both the district court and this court."), *overruled in other part by Hill v. Tangherlini*, 724 F.3d 965, 967 n.1 (7th Cir. 2013).

In any event, IDHS is correct on the merits.  Vovillia admitted to internal investigators that he had a verbal altercation with Early-Coleman in which he told her that she was "full of shit."  Doc. 41 at ¶ 28; Doc. 37-14 at 10.  Multiple witnesses told investigators that the altercation took place in the presence of residents, Doc. 41 at ¶ 28; Doc. 37-14 at 2-11, and Vovillia adduces no evidence to the contrary.  The altercation violated the Kiley Center's policies prohibiting "altercations, verbal or otherwise" and "us[ing] vulgar, profane or loud/disruptive language in the workplace … in a manner directed at or which could disturb clients and/or other staff," Doc. 41 at ¶¶ 67-68 (quoting Doc. 37-30 at 1, 6), and therefore provided a legitimate and nonretaliatory basis for the suspension.  *See Hnin v. TOA (USA), LLC*, 751 F.3d 499, 506-07 (7th Cir. 2014) (holding that coworkers' reports that the plaintiff "intimidated or threatened" them provided a legitimate, nondiscriminatory reason for the plaintiff's termination); *Coleman v. Donahoe*, 667 F.3d 835, 846 (7th Cir. 2012) (noting that an employee's violation of the employer's code of conduct is a legitimate, nondiscriminatory reason for termination); *Overly v. KeyBank Nat'l Ass'n*, 662 F.3d 856, 860, 863 (7th Cir. 2011) (holding that the plaintiff's violation of company policy was a legitimate, nondiscriminatory reason for issuing a formal warning and a fine).  Vovillia adduces no evidence discrediting IDHS's

explanation for the suspension. It follows that no reasonable jury could find that Vovillia was suspended due to his protected activities.

### C. Involuntary Leave

As with the reassignments, IDHS acknowledges that it placed Vovillia on leave partly in response to his UERs, but it again offers a nonretaliatory explanation: Vovillia "was reporting hearing harassing comments that no one else heard, and his coworkers began to fear for their safety," particularly after he mentioned his concealed carry permit. Doc. 36 at 14-15. That explanation is legitimate and supported by the record.

In documenting their decision to place him on leave pending a fitness for duty evaluation, Vovillia's supervisors noted his confrontations with coworkers over comments and gestures that they suspected he had imagined, his coworkers' reported "concerns for their own personal safety and the safety of" the residents, and their own concerns about the possibility that he had a concealed weapon. Doc. 37-21 at 2. Those concerns justified IDHS's decision to require Vovillia to undergo a fitness for duty evaluation. *See Milliman v. Cnty. of McHenry*, 893 F.3d 422, 433-34 (7th Cir. 2018) (holding that the plaintiff's "bizarre allegations" that raised concerns about "a potential mental health issue" justified his employer's decision to refer him for a psychological evaluation). In turn, Dr. Hanlon's opinion that Vovillia was not fit for duty was a legitimate, nonretaliatory reason for placing him on disability leave. *See id*. at 433 ("[B]ased upon Dr. Grote's [psychological evaluation], [defendants] honestly believed Milliman was unfit for duty. In light of that honest belief, defendants had a legitimate non-retaliatory reason to terminate Milliman, and we may not second-guess that decision.") (citation and internal quotation marks omitted). Vovillia points to no record evidence from which a reasonable jury could find that IDHS was dishonest in doubting his fitness for duty and then concluding that he was unfit, or in citing those doubts and conclusions as grounds for placing him on leave. *See*

*Lauth v. Covance, Inc.*, 863 F.3d 708, 715-16 (7th Cir. 2017) (holding that the defendant employer was entitled to summary judgment where the plaintiff did not "cite any evidence that would allow for a reasonable inference that [the employer] did not have honest concerns about his communication style and behavior").  A reasonable jury therefore could not find that IDHS placed him on leave in retaliation for his protected activities.

## Conclusion

IDHS's summary judgment motion is granted in part and denied in part.  The motion is granted as to Vovillia's retaliation claim.  The case will proceed to trial on his hostile work environment claim.

July 9, 2019

_____
United States District Judge